# United States Court of Appeals

*for the*

# Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

– v. –

JALEN CRAIG MCMILLAN,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

## OPENING BRIEF OF APPELLANT

MARC G. HALL
LAW OFFICE OF MARC G. HALL, P.C.
6411 Ivy Lane, Suite 304
Greenbelt, Maryland 20720
(240) 205-3041
mghlaw@mac.com

*Attorneys for Defendant-Appellant*

C P COUNSEL PRESS   (800) 4-APPEAL • (81124)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................. ii

JURISDICTION ............................................................................. 1

STATEMENT OF ISSUES ............................................................. 1

STATEMENT OF CASE ................................................................ 1

STATEMENT OF FACTS ............................................................. 2

SUMMARY OF ARGUMENT ...................................................... 7

ARGUMENT ................................................................................. 8

    I.    THE TRIAL COURT ERRED IN PERMITTING
          GOVERNMENT WITNESS TO TESTIFY AS TO
          INTERMIX FACTUAL AND OPINION TESTIMONY .................. 8

          A.    Standard of Review ................................................. 8

          B.    Argument ................................................................. 8

    II.    THE TRIAL JUDGE ERRED IN ALLOWING THE
          UNCORROBORATED TESTIMONY OF AN
          ACCOMPLICE TO GO BEFORE THE JURY,
          AND AS A RESULT, THE APPELLANT WAS
          FOUND GUILTY ............................................................. 11

    III.    THE DISTRICT COURT ERRED IN DENYING THE
          DEFENDANTS' RULE 29 MOTION FOR JUDGMENT
          OF ACQUITTAL ............................................................. 14

          A.    Standard of Review ................................................. 14

          B.    Applicable Law ........................................................ 14

CONCLUSION ............................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Daily v. United States,*
  282 F.2d 818 (9th Cir. 1960) ...............................................................................15

*Gomez v. United States,*
  490 U.S. 858 (1989)..............................................................................................11

*Hammer v. United States,*
  271 U.S. 620 (1926)........................................................................................ 11, 13

*Ianelli v. United States,*
  420 U.S. 770 (1975)..............................................................................................15

*United States v. Baptiste,*
  596 F.3d 214 (4th Cir. 2010) ..................................................................................9

*United States v. Bostian,*
  59 F.3d 474 (4th Cir. 1995) ....................................................................................8

*United States v. Burgos,*
  94 F.3d 849 (4th Cir. 1996) ..................................................................................14

*United States v. Campbell,*
  977 F 2d 854 (4thCir. 1992) .................................................................................14

*United States v. Edmonds,*
  679 F.3d 169 (4th Cir. 2012) ................................................................................15

*United States v. Fisher,*
  912 F.2d 728 (4th Cir.1990) .................................................................................14

*United States v. Gibbs,*
  190 F.3d 188 (3d Cir.1999)......................................................................................8

*United States v. Griffith,*
  118 F.3d 318 (5th Cir.1997) ....................................................................................8

*United States v. Hackley,*
  662 F.3d 671 (4thCir. 2011) .................................................................................14

*United States v. Hickman,*
  626 F.3d 756 (4th Cir. 2010) ................................................................................15

*United States v. Johnson*,
   54 F.3d 1150, (4th Cir. 1995) ...................................................................8

*United States v. Johnson*,
   617 F.3d 294 (4th Cir. 2010) .............................................................10

*United States v. Lancaster*,
   78 F.3d 888 (4th Cir. 1996) ...................................................................8

*United States v. Shabani*,
   513 U.S. 10 (1994) ...........................................................................15

*United States v. Stockton*,
   788 F.2d 210 (4thCir. 1986) ...............................................................14

*United States v. Tresvant*,
   667 F.2d 1018 (4th Cir. 1982) ...........................................................14

*United States v. Wilson*,
   484 F.3d 267 (4th Cir, 2007) ...................................................... 8, 9, 10

*United States v. Yearwood*,
   518 F.3d 220 (4th Cir. 2008) ...............................................................14

**Statutes & Other Authorities:**

18 U.S.C. § 3231 ...............................................................................1

28 U.S.C. § 1291 ...............................................................................1

# JURISDICTION

The district court had jurisdiction in this case under 18 U.S.C. § 3231 and entered final judgment as to Jalen McMillan on June 6, 2024. Joint Appendix [hereinafter JA] at 943. Mr. McMillan filed his notice of appeal on June 6, 2024, JA 949, within 14 days after entry of judgment in his case. This Court has jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF ISSUES

I.    THE TRIAL COURT ERRED IN PERMITTING GOVERNMENT WITNESS TO TESTIFY AS TO INTERMIX FACTUAL AND OPINION TESTIMONY.

II.   THE TRIAL JUDGE ERRED IN ALLOWING THE UNCORROBORATED TESTIMONY OF AN ACCOMPLICE TO GO BEFORE THE JURY, AND AS A RESULT, THE APPELLANT WAS FOUND GUILTY.

III.  THE DISTRICT COURT ERRED IN DENYING THE DEFENDANT'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL.

# STATEMENT OF CASE

On February 16, 2024, after a jury trial, the appellant was convicted of the following offenses: Count One, Conspiracy to Commit Bank Fraud; Count Two, Bank Fraud; Count Five, Bank Fraud, Count Six, Bank Fraud and Count Eleven, Aggravated Identity Theft. JA10.

On June 5, 2024, a sentence of thirty months was imposed on Counts One, Two, Five and Six. A sentence of 24 months consecutive was imposed as to Count Eleven for a total of 54 months. JA 949. The appellant, Mr. McMillan, now appeals his conviction.

## STATEMENT OF FACTS

Between June of 2018 and March of 2020, the appellant, Jalen Macmillan, Jovan Bell, Archie Paul and others are alleged to have conspired to commit Bank Fraud. JA14. Navy Federal Credit Union (NFCU) is a federally insured credit union with locations throughout Maryland including a branch in Laurel, Maryland, where most of the events in this case occur. Archie Paul was the originator of a scheme to commit fraudulent transactions at this banking institution. JA 351. The crux of the government's case was that Jalen McMillan and Joven Bell were employees at the Navy Federal Credit Union branch in Laurel. JA352. Either Mr. Paul or one of his other co-conspirators would go into the credit union. JA352. There they would open a bank account using fraudulently obtained personal identifying information (PII) of an innocent person. JA352. This information would usually consist of another person's name, address, social security number and other personal information. JA351. Then, the co-conspirator would apply for and would usually obtain a loan that same day at the credit union. JA352. They would then leave with either the loan proceeds in cash or deposit a check that they could draw against. The alleged role of

Jovan Bell and Jalen McMillan was to make sure the account opening, and the loan went through smoothly, for which they received a kickback from Mr. Paul. JA353.

During the trial, the government focused on six transactions. The first transaction was the Zion Davis transaction, which was the subject of a substantive count of bank fraud. On June 15th, 2018 Archie Paul entered the Laurel branch of the NFCU. JA168. There, Mr. Paul posed as Zion Davis and opened an account at the bank. JA164. The credit union employee who assisted Mr. Paul was Jalen McMillan. JA170. The government introduced the bank records of this transaction. JA603. The government had also obtained the text messages from the phones of Mr. Paul and Mr. MacMillan to show their prior communication. JA690. Paul then accessed the account in August by depositing a fraudulent check in the amount of $22,324.56. JA184, 605. The check was made out to "Zion Davis," and was deposited into an ATM in Rockville, Maryland. JA606. On August 20, 2018, the check was returned by Bank of America as fraudulent and NFCU subsequently locked the "Zion Davis" account. JA605. When Paul was arrested at a later date, he was in possession of a fraudulent driver's license in the name of "Zion Davis" depicting a picture of Paul. JA165.

On or about October 17, 2019, Paul paid another co-conspirator, John Washington, $150.00 to create a driver's license using the stolen identity of a real person, but with a picture of another co-conspirator. JA503. Washington testified at

trial and explained his history of making fraudulent ID's and that he made several for Archie Paul. JA509. On October 18, 2019, at Paul's direction, another co-conspirator opened a NFCU account at the Laurel branch under the identity of Gretchen Mock, one of the victims. JA372. Jovan Bell serviced the transaction, and with his assistance, this co-conspirator obtained a $25,000 consumer loan. JA373. At Paul's direction, the co-conspirator withdrew $24,000 in cash. JA373. Approximately ten minutes after the transaction, ATM surveillance captured Paul withdrawing an additional $1,000 from the account containing the proceeds of the fraudulently obtained loan. JA374.

In October 2019, Paul employed Washington to again manufacture two fraudulent Texas driver's licenses using the stolen identities of two real people, referred to in the indictment as Victims 2 and 3 in the indictment. JA520. Paul sent a photo of himself with Victim 2's Personal Identifying Information (PII) and a photo of another co-conspirator with Victim 3's PII. JA520. Paul informed Jovan Bell that he and another co-conspirator would be coming to the bank together using drivers' licenses from Texas. JA364. They then did, in fact, go to NFCU at which time Paul and another co-conspirator opened bank accounts using the stolen identities JA374. Paul then fraudulently obtained a $23,000 consumer loan in the name of Victim Patrick Johnson which was then deposited into an account that was fraudulently opened in Victim 2's name. JA209. This co-conspirator fraudulently

4

obtained a $25,000 consumer loan in the name of Victim 3, which was deposited into Victim 3's fraudulently obtained account. JA374. The money was subsequently withdrawn.

On October 25, 2019, Paul sent McMillan the PII of Felecia Franco, another real person. JA295. On November 2, 2019, McMillan used his special access to NFCU's customer database to allegedly steal confidential customer PII belonging to Franco. JA296. McMillan then provided this information to Paul, who again hired Washington to manufacture a fraudulent driver's license in Franco's name but bearing co-conspirator 4's photo. JA295. On November 2, 2019, at Paul's direction, co-conspirator 4 opened a NFCU account using Franco's PII. JA295. McMillan serviced the transaction and assisted another co-conspirator in obtaining a $10,000 consumer loan in Victim 4's name. This co-conspirator immediately withdrew the funds in cash. JA298.

On March 22, 2020, Tiffany Williams received a message from yet another co-conspirator who provided Williams with the PII belonging to Emily Myers, a real person, which included Myers's credit score and social security number. JA108. On March 24, 2020, Williams opened an account over the telephone with NFCU, using Myers' identity. JA134. She then obtained a $65,000 auto loan in Myers' name which was deposited into the fraudulent account. JA134. Williams then recruited another co-conspirator to impersonate Myers to assist Williams in the withdrawal of

the funds. JA121. Messages from March 25, 2020, between Williams and co-conspirator show Williams gave Myers' PII to the co-conspirator and instructed the co-conspirator to meet her at the Glenarden NFCU branch. JA121. Bank surveillance video captured the co-conspirator entering the Glenarden branch, identifying herself as Myers, and presenting a driver's license in the name of Myers. JA121. However, the co-conspirator was unsuccessful in securing the $65,000 because the bank representative suspected the driver's license to be fraudulent. JA124.

After this failed incident, Williams messaged Paul and informed him of what had occurred. JA127. After speaking with Paul, Williams decided to impersonate Myers herself and obtain money from NFCU. JA127. Williams expressed to Paul that she would make a second attempt to obtain the money using Myers' identity. JA127-128. Williams inquired whether Paul would assist her and offered to pay Paul $10,000 if he organized a transaction with one of his bank insiders at the Laurel branch. JA Paul agreed stating, "Tiffany I let you use my inside .. im let you know right now .. no funny business .. im cool with that cut you said … but no funny business." JA144. Paul then sent Williams the address to the Laurel branch and Williams informed Paul that she would be using Myers's identity. JA145. Paul then messaged McMillan to inform him that Williams was on her way and that she would be using Myers' identity. JA159. Bank surveillance video shows that soon thereafter, Williams entered the Laurel branch and mistakenly went to a teller, instead of

McMillan. JA159. Williams presented a driver's license bearing Myers' information and Williams' photograph in an attempt to withdraw the $65,000 in loan proceeds. The teller, suspecting that the license was fraudulent, contacted law enforcement. McMillian then messaged Paul telling him to inform Williams to "dip now." JA162. Williams was arrested while attempting to flee. JA120, 162.

On May 13, 2020, a black Apple iPhone, used in furtherance of the conspiracy, was seized from McMillan and searched pursuant to a search warrant. Law enforcement discovered dozens of communications between McMillan and his co-conspirators detailing his role in the scheme, including kickbacks McMillan would receive for facilitating the fraudulent transactions for Paul. JA 155-156.

## SUMMARY OF ARGUMENT

The district court erred in allowing Detective Kropff to intermix factual testimony with opinion testimony, invading the province of the jury. The court also erred when it allowed the uncorroborated testimony of a co-conspirator to be the only direct testimony of the appellant's involvement. Finally, the court should have granted the defense Rule 29 motion based upon sufficiency of the evidence presented at the close of the government's case.

# ARGUMENT

## I. THE TRIAL COURT ERRED IN PERMITTING GOVERNMENT WITNESS TO TESTIFY AS TO INTERMIX FACTUAL AND OPINION TESTIMONY.

### A. Standard of Review:

The decision regarding the admission of evidence is vested in the discretion of the trial court and is reviewed by this Court for the abuse of this discretion. *United States v. Lancaster,* 78 F.3d 888, 896 (4th Cir. 1996); U*nited States v. Bostian*, 59 F.3d 474, 480 (4th Cir. 1995).

### B. Argument:

As a general principle, expert testimony from law enforcement witnesses in this context can be admissible. For example, "Because the primary purpose of coded drug language is to conceal the meaning of the conversation from outsiders through deliberate obscurity, drug traffickers' jargon is a specialized body of knowledge and thus an appropriate subject for expert testimony. Uni*ted States v. Gibbs*, 190 F.3d 188, 211 (3d Cir.1999), citing *United States v. Griffith*, 118 F.3d 318, 321 (5th Cir.1997). This Court has permitted an expert to testify as to drug related words and slang. Such testimony, however, necessarily is limited to words and slang that needed interpretation. *United States v Johnson*, 54 F.3d 1150, (4th Cir. 1995) and *United States v Wilson*, 484 F.3d 267 (4th Cir, 2007).

The Fourth Circuit outlined in *United States v. Wilson*, 484 F.3d 267 (2007) the appropriate manner in which narcotics officers should be qualified as experts. The Fourth Circuit noted the detective's testimony of "It all depends on the context of the calls… I take the person who's talking, the conversation. I take what has this person, what's the routine pattern of this person before and the pattern after. That's how I make my determination. When you hear a word time and time again then there's a pattern that develops that ultimately shows you what they're talking about."

The Circuit Court in *Wilson* found "although the district court erred in failing to exclude Seabolt's testimony when that testimony either interpreted language that needed no interpretation or when Seabolt failed to adequately explain his methodology in reaching a questionable interpretation; the net effect was harmless because the overwhelming majority of Seabolt's expert testimony was properly admitted, that properly admitted testimony was alone sufficient to show appellant's guilt… and any prejudice that flowed from the limited amount of improper testimony was outweighed by Seabolt's properly admitted testimony and the corroborative testimony of co-conspirators."

In *United States v. Baptiste*, 596 F.3d 214, 222-23 (4th Cir. 2010) the Fourth Circuit noted "the detective decoded the conversations by examining them in the context of other calls placed between the suspects which were corroborated at trial by actual participants of those conversations."

In *United States v. Johnson* 617 F.3d 294 (4ᵗʰ Cir. 2010) and *Wilson* 484 F.3d at 276-77 the Fourth Circuit held "expert witnesses must adequately explain why he interpreted certain phrases and words in wiretapped conversations." The Court continued, "a defendant must apprise the district court of any inadequately explained interpretations in order to preserve his objection."

Here, the investigating agent, Detective Kropff, performed at times the same function related to the bank fraud investigation. However, Detective Kropff's testimony veered too far away from just deciphering "coded" language to giving a wholesale interpretation of the narrative of this case. By doing so, Kropff went beyond what was acceptable and his opinions invaded the province of the jury.

For example, in his first day of testimony Detective Kropff was allowed to state, over objection, the following interpretation of the events of March 25, 2020:

> "I'm reading this conversation, and initially I see Ms. Williams talk to
> Mr. Paul about the Capitol Heights branch and the girl going in blind for
> a loan that was approved. And I'm starting to understand that that is the
> Glenarden transaction where the first female went in and presented the ID
> to employee James Johnson, and ultimately, she walked out and left.
> Ms. Williams is then asking Mr. Paul if she should go in with another face,
> with another ID, if she gets one. And then she asks Mr. Paul if she can use
> his inside. And to me, my understanding, based on my training, knowledge
> and experience, inside is often referring to a bank insider or an individual
> that works in a branch of a financial institution, from the inside, to allow the
> fraud to – that aids in the fraud scheme." JA145.
> This was not interpreting words or phrases. This was giving an opinion as to

the events that occurred without being qualified as an expert.

Again, shortly thereafter the following colloquy occurred:

Can you describe that video for us?
A. The camera view at the front door, there was an individual standing there that was -- appeared to be looking down several times consistent with the time frame that the messages were being read.
MR. HALL: Objection. JA153.

As before, this is eliciting an opinion from a non-expert. His interpretation that the appellant was looking down at his phone is a subjective call on his part. It is for the jury to make such a determination, not the investigating officer.

Agent Kropff's testimony was replete with such transgressions. By allowing an authority figure, the Detective in charge of the case, to narrate in such a fashion, his testimony veered too far from merely interpretating code words of phrases.

## II. THE TRIAL JUDGE ERRED IN ALLOWING THE UNCORROBORATED TESTIMONY OF AN ACCOMPLICE TO GO BEFORE THE JURY, AND AS A RESULT, THE APPELLANT WAS FOUND GUILTY.

In *Gomez v. United States,* 490 U.S. 858 (1989), the United States Supreme Court stated as follows: Among those basic fair trial rights that "can never be treated as harmless" is a defendant's right to an impartial adjudicator, be it judge or jury. *Gomez v. United States,* 490 U.S. 858, 876 (1989).

There is case law that clearly states that a defendant cannot be convicted on the uncorroborated testimony of an accomplice. *Hammer v. United States*, 271 U.S. 620 (1926). This Honorable Court has the discretion to review this claim under the Plain Error rule, and the appellant invites the Court to do so in the interest of justice.

During the appellant's trial, several witnesses testified, but none of them witnessed the appellant committing any of the charged offenses, nor did they provide testimony that the appellant committed the crimes as alleged in the indictment. The trial transcript of those witnesses' testimony clearly supports the argument listed herein. However, the appellant's co-defendant, Jovan Bell, did testify and attempted to connect the appellant to the crime.

Mr. Bell testified that both he and the appellant were in a conspiracy with Archie Paul and others to commit bank fraud. Archie Paul would procure the PII information of a someone with good credit. JA349. He or another co-conspirator would then go to the bank to open accounts in that person's name and get some type of loan. JA351. They would then withdraw the proceeds of the loan. JA351. The role of Mr. Bell and allegedly the appellant as bank employees was to provide the necessary bank services to the co-conspirator so that if anything did not look right in the transaction, it would not be flagged by the bank.

The trial judge allowed Mr. Bell's testimony to go to the jury, even though no other witnesses connected the appellant to the crime. The question is, when does a judge step in and protect a defendant's right to a fair trial?

At the trial several people would have been available to the government that could have corroborated the testimony of Jovan Bell. If Mr. Bell's testimony were true, Archie Paul would have known every detail of these transactions. He was not

called. Tiffany Williams could have corroborated the March 22, 2020, transaction as allegedly she was to work with the appellant to obtain the proceeds of an approved loan. However, the government did not call her.

The government did call John Washington who made the fraudulent ID's used in this case. However, he only dealt with Archie Paul and did not know the appellant. Therefore, the only witness that could include the appellant as a co-conspirator was Jovan Bell. JA

However, Jovan Bell's credibility was impeached during the trial. He testified that he was not truthful during his first meetings with the agents investigating the case. He admitted he had a motive to be less than truthful because he hoped his cooperation would result in a lesser sentence for him. Finally, he had a wholly fabricated story about meeting with the appellant to discuss wiping their phones for which there was no evidence that confirmed that they had done this.

Under *Hammer v. United States*, supra, the uncorroborated testimony of Jovan Bell was insufficient to convict the appellant and without that testimony there was scant testimony linking the appellant to the crime.

## III. THE DISTRICT COURT ERRED IN DENYING THE DEFENDANTS' RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL.

### A. Standard of Review

Denial of a Rule 29 motion for judgment of acquittal should be affirmed on appeal if, "viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Tresvant,* 667 F.2d 1018 (4th Cir. 1982).

### B. Applicable Law

In examining the issue of a denial of a Rule 29 motion, the appellate court considers "circumstantial as well as direct evidence and allows the government the benefit of all reasonable inferences from the facts proven. *Tresvant*, 667 F. 2nd at 1021. *Accord United States v Campbell*, 977 F 2d 854, 856 (4th Cir. 1992); *United States v. Fisher*, 912 F2d 728, 730 (4th Cir. 1990) *and United States v Stockton,* 788 F.2d 210, 218 (4th Cir. 1986).

In order to prove conspiracy, the government was required to establish beyond a reasonable doubt that (1) an agreement to commit wire and mail fraud existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy. *United States v. Hackley*, 662 F.3d 671 (4th Cir. 2011); *United States v. Yearwood*, 518 F.3d 220, 225 – {662 F.3d 679} 26 (4th Cir. 2008); *United States v. Burgos*, 94 F.3d 849, 857

(4th Cir. 1996) (en banc). Also see: *United States v. Hickman*, 626 F.3d 756 (4th Cir. 2010); *United States v. Edmonds,* 679 F.3d 169 (4th Cir. 2012). The essence of conspiracy is the agreement. *United States v. Shabani*, 513 U.S. 10, 16 (1994) (quoting *Ianelli v. United States,* 420 U.S. 770, 777 (1975)). Evidence of a knowing and voluntary agreement distinguishes conspiracy from the completed crime and is therefore an essential element of the crime of conspiracy. To prove appellants' participation in the overall conspiracy, the government was required to prove the agreement to effectuate the conspiracy's central criminal design, to commit mail and wire fraud and that the appellants had actual knowledge of the conspiracy's existence. *See Daily v. United States*, 282 F.2d 818, 820 (9th Cir. 1960).

The government failed to present sufficient evidence to convince a rational trier of fact that the appellant, McMillan, was guilty beyond a reasonable doubt. The government failed to establish that a criminal partnership existed in this case. The appellant's employment at the NFCU at the time and place the crimes occurred did not translate into criminal activity. In this case, the jury was not presented with direct evidence of a scheme or artifice to defraud NFCU, and the government did not present evidence of appellant's knowledge of a fraudulent intent, let alone his specific intent to defraud NFCU.

The only evidence the government was able to establish that was evidence that the appellant was aware of the fraudulent scheme whirling around him was the

uncorroborated testimony of Jovan Bell. As demonstrated above, this was not sufficiently reliable to stand as a foundation for a criminal conviction. Having demonstrated why it was in itself insufficient for a criminal conviction, the only remaining evidence of Mr. McMillan's involvement was the fact he was present at NFCU on the dates and times these acts occurred.

The evidence at trial established that his presence alone could not establish that McMillan was guilty beyond a reasonable doubt. Rather, the evidence elicited at trial established McMillan's good faith in the performance as work. Under these circumstances, this Court should reverse the convictions and judgments below and remand this case for a new trial.

## CONCLUSION

For the foregoing reasons, the appellant, Jalen McMillan, requests that this Court vacate his conviction and sentence and remand this case to the district court for further proceedings.

## REQUEST FOR ORAL ARGUMENT

Jalen McMillan through counsel, requests oral argument on the matters presented herein.

LAW OFFICE OF MARC G. HALL, P.C.

/s/ *Marc G. Hall*
Marc G. Hall
6411 Ivy Lane Ste. 304
Greenbelt, Maryland 20770
Tel:    (240) 205-3041
Email: MGHLaw@mac.com

*Attorney for Jalen McMillan*

**CERTIFICATE OF COMPLIANCE**

**CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH LIMITATIONS TO BE INCLUDED IMMEDIATELY BEFORE THE CERTIFICATE OF SERVICE FOR ALL BRIEFS FILED IN THIS COURT.**

1.    This brief has been prepared using:

Microsoft Word, Fourteen point, Times New Roman

2.    EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules or regulations, and the certificate of service, the brief contains:

3840 Words

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or a copy of the work or line printout.

Dated: October 17, 2024                     /s/ Marc G. Hall
                                            *Counsel for Appellant*