No. 24-4307

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### UNITED STATES OF AMERICA,

**Plaintiff - Appellee,**

v.

### JALEN CRAIG MCMILLAN,

**Defendant - Appellant.**

*Appeal from the United States District Court for the*
*District of Maryland, Southern Division*
*The Honorable Peter J. Messitte, Senior U.S. District Judge*

## RESPONSE BRIEF OF APPELLEE
## UNITED STATES OF AMERICA

Erek L. Barron
United States Attorney

David C. Bornstein
Assistant United States Attorney
Chief, Appellate Division

Brandon K. Moore
Assistant United States Attorney
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4800

*Attorneys for the Appellee*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................1

ISSUES PRESENTED............................................................................1

STATEMENT OF FACTS .....................................................................2

A.    The Offense...................................................................................2

       1.    June 15, 2018 – "Zion Davis" ...........................................3

       2.    November 2, 2019 – Felicia Franco and Alexander Oduro .................4

       3.    March 25, 2020 – Emily Myers .........................................5

B.    The Trial.......................................................................................7

C.    The Rule 29 Motion......................................................................9

SUMMARY OF ARGUMENT...............................................................9

ARGUMENT .......................................................................................11

I.    THE DISTRICT COURT PROPERLY ADMITTED INVESTIGATOR KROPFF'S TESTIMONY..................................................................11

    A.    Standard of Review .................................................................11

    B.    Factual Background..................................................................12

    C.    An Objection Based on Expert Testimony Was Not Preserved, and Any Such Error Does Not Survive Plain Error Review.............................13

    D.    The Explanations Were Lay Testimony .............................................14

    E.    Any Error Was Harmless................................................................18

       1.    Investigator Kropff Would Have Qualified as an Expert..........18

2.     The Testimony Was Duplicative, Largely Uncontested, and
       Overwhelmingly Supported by Other Evidence .......................21

II.    THE DISTRICT COURT PROPERLY ADMITTED BELL'S TESTIMONY .
       ...........................................................................................24

       A.     Standard of Review ...........................................................24

       B.     Uncorroborated Accomplice Testimony Can Support a Conviction, and
              Bell's Testimony Was Thoroughly Corroborated................................24

III.   THE DISTRICT COURT PROPERLY DENIED MCMILLAN'S MOTION
       FOR ACQUITTAL .......................................................................26

       A.     Standard of Review .........................................................26

       B.     The District Court Appropriately Denied the Rule 29 Motion About
              McMillan's Text Messages.................................................27

       C.     For Any Other Grounds, McMillan Cannot Show a Manifest
              Miscarriage of Justice.......................................................28

CONCLUSION .......................................................................................31

STATEMENT ON ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Dubin v. United States*, 599 U.S. 110 (2023) ............................................................29

*Hammer v. United States*, 271 U.S. 620 (1926)....................................................24–25

*United States v. Albertelli*, 687 F.3d 439 (1st Cir. 2012) ........................................20

*United States v. Baker*, 985 F.2d 1248 (4th Cir. 1993) ............................................24

*United States v. Baptiste*, 596 F.3d 214 (4th Cir. 2010)...........................................17

*United States v. Beach*, 296 F.2d 153 (4th Cir. 1961)..............................................25

*United States v. Brandon*, 298 F.3d 307 (4th Cir. 2002)..........................................29

*United States v. Briscoe*, 101 F.4th 282 (4th Cir. 2024) ..........................................26

*United States v. Burfoot*, 899 F.3d 326 (4th Cir. 2018)...........................................29

*United States v. Chong Lam*, 677 F.3d 190 (4th Cir. 2012) ....................................29

*United States v. Crespo*, 2024 WL 3439417 (3d Cir. 2024) ....................................15

*United States v. Darosa*, 102 F.4th 228 (4th Cir. 2024)....................................18–19

*United States v. Duran*, 941 F.3d 435 (10th Cir. 2019) ..........................................15

*United States v. Duroseau*, 26 F.4th 674 (4th Cir. 2022) ........................................28

*United States v. Hunt*, 99 F.4th 161 (4th Cir. 2024)................................................27

*United States v. Johnson*, 117 F.4th 28 (2d Cir. 2024)............................................15

*United States v. Johnson*, 617 F.3d 286 (4th Cir. 2010) ..........................................17

*United States v. Kilpatrick*, 798 F.3d 365 (6th Cir. 2015)........................................20

*United States v. Olson*, 114 F.4th 269 (4th Cir. 2024) ............................................24

*United States v. Robertson*, 68 F.4th 855 (4th Cir. 2023) ........................................24

*United States v. Robinson*, 872 F.3d 760 (6th Cir. 2017).........................................15

*United States v. Simmons*, 11 F.4th 239 (4th Cir. 2021) .........................................11

*United States v. Smith*, 962 F.3d 755 (4th Cir. 2020).............................................18

*United States v. Smith*, 919 F.3d 825 (4th Cir. 2019).............................................19

*United States v. Walker*, 32 F.4th 377 (4th Cir. 2022)...........................................21

*United States v. Watkins*, 111 F.4th 300 (4th Cir. 2024)...................................11, 15

*United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007)......................................17, 19

## STATUTES

18 U.S.C. § 1028A .................................................................................................7

18 U.S.C. § 1344 ...................................................................................................7

18 U.S.C. § 1349 ...................................................................................................7

18 U.S.C. § 3231 ...................................................................................................1

28 U.S.C. § 1291 ...................................................................................................1

## OTHER AUTHORITIES AND SOURCES

Fed. R. Crim. P. 29 ...........................................................................................9, 27

Fed. R. Evid. 103 .................................................................................................13

Fed. R. Evid. 701 .................................................................................................14

Fed. R. Evid. 702 .........................................................................................4, 18, 21

# JURISDICTIONAL STATEMENT

A jury convicted Appellant Jalen Craig McMillan of multiple federal offenses related to bank fraud and identity theft. JA 943. The district court (Hon. Peter J. Messitte, J.) sentenced him to a total term of 54 months' imprisonment followed by five years of supervised release. JA 944–945. The district court had jurisdiction under 18 U.S.C. § 3231 and entered its judgment of conviction on June 6, 2024. McMillan timely appealed the same day. JA 949. This Court has jurisdiction under 28 U.S.C. § 1291.

# ISSUES PRESENTED

1. Whether, on plain error review, the district court properly allowed a government witness to testify about the evidence he received as a way to explain the investigation and the reasons for his subsequent actions, and if the claim were preserved, whether any error was harmless.

2. Whether, on plain error review, the district court properly admitted the testimony of an accomplice, where multiple witnesses and pieces of evidence corroborated that testimony.

3. Whether the district court appropriately denied the motion for acquittal where overwhelming evidence connected McMillan to his own text messages and no manifest miscarriage of justice has occurred as to his other grounds for acquittal.

# STATEMENT OF FACTS

## A.    The Offense

Appellant Jalen Craig McMillan helped his co-defendant, Archie Paul, steal

over $165,000 from the Navy Federal Credit Union ("NFCU") through fraud.  *See*

JA 947.[1]  The following facts were elicited during his jury trial.

McMillan and another co-conspirator, Joven Bell, worked together at the

NFCU branch in the Laurel Lakes shopping center in Laurel, Maryland.  JA 38–40,

JA 88, JA 116, JA 350.  They had multiple responsibilities.  Some days, they greeted

customers—the credit union members—as they entered the bank.  JA 39–40, JA 53.

Other days, they were tellers, assisting members with various tasks, including loan

applications.  JA 39–40, JA 53.  This gave McMillan and Bell access to non-public

member information, with the ability to open new accounts and process loans.

JA 40–44, JA 358.

Paul exploited their employment status, using them as inside men to

accomplish the scheme.  JA 144, JA 368.  Generally, Paul communicated with

McMillan and Bell in advance, telling them what he needed—to open an account,

get a loan, or withdraw money.  JA 353–355.  He identified who would enter the

---

[1] The government sought restitution for only one victim—NFCU—for the actual losses resulting from the scheme, about $165,891.68.  *See* Kropff Aff. ¶ 79, ECF No. 249-1, in *United States v. Archie Arnold Paul et al.*, Crim. No. PJM-22-0231 (D. Md.).

bank (either himself or an accomplice) to carry out the fraudulent transaction, and he confirmed that McMillan or Bell would be inside the bank and in a position to help. JA 353–355.

Although six total transactions were presented during trial, the following three transactions formed the core of the government's case against McMillan.

### 1. June 15, 2018 – "Zion Davis"

During the first transaction, Paul tried to withdraw about $22,000 from NFCU. On June 15, 2018, McMillan, at Paul's direction, created a fraudulent NFCU account using the fictitious identity "Zion Davis." JA 167. McMillan texted Paul beforehand to coordinate. Among other things, they discussed the maximum dollar amount to avoid red flags ("Did you find out the limit?"), and when McMillan would be inside the bank ("I'll tell you my schedule so I know I'm on that side"). JA 177–179.

Notably, to join NFCU, an applicant must have ties to the military. JA 43, JA 189, JA 360. A family or household member can sponsor a non-military applicant by providing an access number unique to the sponsor's NFCU account. JA 43, JA 189, JA 360. Before going into the bank, Paul texted McMillan fraudulent sponsor information, belonging to a real person named Kelly Capuano, so that McMillan would be prepared. JA, 169, JA 182. McMillan confirmed when

everything was ready: "Come in now and say [K]elly told you to come to Jalen." JA 183. Paul responded, "Okay. I'm Zion." JA 183.

McMillan then created the account. His name and employee ID number appeared on the "Zion Davis" membership application. JA 603. Timesheets confirmed that he was working at the Laurel Lake branch that day. JA 171, JA 602.

A few months later, Paul deposited a counterfeit check for about $22,000 made out to "Zion Davis." JA 184, JA 604–607. McMillan texted Paul: "My managers are at the front and they got Zion account pulled up." JA 186. The two of them discussed how NFCU froze the account before the money could be withdrawn. JA 186.

### 2. November 2, 2019 – Felicia Franco and Alexander Oduro

The second transaction involved Paul successfully withdrawing $10,000 by getting a fraudulent consumer loan. On November 2, 2019, a woman, at Paul's direction, opened an account using the name and personal information of a real person, Felicia Franco. JA 295. McMillan serviced the transaction and helped the woman. JA 299. His name and employee ID number appeared on Felicia Franco's membership application. JA 296, JA 469, JA 646. Timesheets confirmed that McMillan was working at the Laurel Lake branch that day. JA 644. Surveillance footage showed McMillan with the woman who pretended to be Felicia Franco. JA 302–303, JA 470, JA 645.

Felicia Franco's membership application listed another real person, Alexander Oduro, as the sponsor with Alexander Oduro's real access number. JA 299. That morning, Paul texted McMillan: "Her grandfather sponsoring her, Alexander Oduro." JA 471. Bank records show that McMillan accessed Alexander Oduro's account, consistent with that exchange. JA 303, JA 647.

Paul and McMillan then coordinated when McMillan would be available inside the bank, distinctly hinting that the scheme was a fraud: "Should we come in? I mean her, LOL." JA 472. McMillan confirmed that he was available: "Yeah, perfect time." JA 472. After opening the account and getting the loan, the woman immediately withdrew the money. JA 469.

The real Felicia Franco did not open the account and did not seek a $10,000 loan. JA 332–335. Although the real Alexander Oduro was a previous NFCU member, he no longer had an account and did not sponsor Felicia Franco's application. JA 339–340. The real Felicia Franco and Alexander Oduro did not know each other. JA 333, JA 340.

### 3. March 25, 2020 – Emily Myers

The final transaction involved Tiffany Williams, an acquaintance of Paul, who tried—but failed—to withdraw $65,000 using a fraudulent account. On March 20, 2020, Williams used the identity of a real person, Emily Myers, to open an account. JA 134, JA 678. She then obtained a $65,000 auto loan in Emily Myers's name.

JA 134, JA 285, JA 679.  The real Emily Myers did not open the account or apply for the loan.  JA 106, JA 110.

Williams initially recruited another woman to withdraw the money from a different NFCU branch.  JA 121, JA 141.  When that did not work, Williams decided to withdraw the money herself at the Laurel Lakes branch.  JA 120–122, JA 142. She texted Paul, acknowledging the transaction was fraudulent: "They not locking nobody up right now for fraud."  JA 143.  Williams then asked if Paul would help her setup a transaction with one of his insiders at the Laurel Lakes branch: "Or if I give you ten, you think your man can pull it and give it to me if I come in there with a face?"  JA 143.  Paul agreed, and he coordinated with McMillian to be the inside man.  JA 143, JA 159–162.

On March 25, 2020, Williams entered the Laurel Lakes branch with a fake driver's license for Emily Myers.  JA 90, JA 121.  Timesheet records show that McMillan was working at the Laurel Lakes branch that day.  JA 681.  Surveillance footage shows him standing by the door as Williams entered the bank.  JA 89, JA 96. Paul texted McMillan that Williams had arrived ("She said she there, so she walk up?") and that she would be using Emily Myers's identity ("Emily Myers").  JA 159.)

Then things went awry.  Williams walked by McMillan and mistakenly went to a different teller.  JA 90, JA 159, JA 250.  McMillan texted Paul that Williams had gone to the wrong person.  JA 159.  Williams texted Paul the same thing: "I'm at a

regular teller, WTF?"  JA 146.  Paul responded, "Oh, Lord, that's not my mans."

JA 147.

The teller, suspecting that the license was fraudulent, contacted law enforcement.  JA 92.  Plus, the branch knew that someone had tried to withdraw the money at a different branch earlier that day.  JA 162.  McMillan texted Paul that Williams should leave: "Dip now."  JA 160.  Williams left the bank but was arrested a short time later.  JA 120, JA 251.

## B.    The Trial

A grand jury charged Paul, Williams, and McMillan with multiple offenses for the scheme.[2]  JA 14–JA 29.  McMillan was charged in the following five counts:

| Count | Offense | Statute |
|-------|---------|---------|
| 1 | Conspiracy to Commit Bank Fraud | 18 U.S.C. § 1349 |
| 2, 5, 6 | Bank Fraud | 18 U.S.C. § 1344 |
| 11 | Aggravated Identity Theft | 18 U.S.C. § 1028A |

*Id*.

---

[2] The grand jury charged a fourth defendant, John Washington, in the same case.  The government charged Bell in a separate information.  *See United States v. Jovan Bell*, Crim. No. PJM-20-0438 (D. Md. filed Dec. 7, 2020).

McMillan's charges, listed here, related to the broader conspiracy, as well as the three core transactions discussed above:

| Count | Date | Offense | Identity Used |
|---|---|---|---|
| 1 | June 2018 – March 2020 | Conspiracy to Commit Bank Fraud | Victims 1–6 |
| 2 | June 15, 2018 | Bank Fraud | "Zion Davis" |
| 5 | November 2, 2019 | Bank Fraud | Victim 4 (Felicia Franco) |
| 6 | March 25, 2020 | Bank Fraud | Victim 6 (Emily Myers) |
| 11 | November 2, 2019 | Aggravated Identity Theft | Victim 5 (Alexander Oduro) |

*Id.*

McMillan was the only defendant who went to trial. JA 9–10. Among the evidence introduced were the timesheets, bank records, surveillance footage, and text messages. Multiple government witnesses testified, including:

- two investigators (Joseph Kropff with the United States Secret Service and Brett Hoover with NFCU), JA 115, JA 228, JA 465;

- five victims (including Felicia Franco, Emily Myers, and Alexander Oduro), JA 106, JA 330, JA 338; and

- two cooperators (including Bell), JA 346.

Bell testified that he and McMillan worked together at the Laurel Lakes branch. JA 350. He and McMillan were in the scheme with Paul. JA 352. They knew each other in high school, as evidenced by a yearbook with the three of them in it. JA 347, JA 349, JA 551–555. Bell also explained how the scheme worked.

Paul or an accomplice would apply for membership using fake credentials, obtain a credit card or loan, then withdraw the cash. JA 352–353. Whichever inside man processed the transaction—either Bell or McMillan—would get a portion, or "cut," of the money. JA 183, JA 351, JA 353.

## C. The Rule 29 Motion

After the government's case in chief, McMillan moved for acquittal. JA 529, JA 531. *See* Fed. R. Crim. P. 29(a). He made only one argument—that the evidence insufficiently tied him to the messages on his cellphone. JA 531. The district court denied the motion. JA 533–534.

The jury convicted McMillan on all counts. JA 943. On June 6, 2024, the district court sentenced McMillan to a total term of 54 months in prison. JA 944. He timely appealed. JA 949.

## SUMMARY OF ARGUMENT

1. McMillan did not preserve a challenge to Investigator Kropff's testimony as improper expert testimony. Nevertheless, any claim should fail. Investigator Kropff described the text messages and video, not for the truth of his impressions, but to explain the investigation and the reasons for his next investigative steps. Because they were his real-time impressions, and the government did not ask the jury to agree with them, Investigator Kropff did not need to be qualified as an expert before describing them. Even then, Investigator Kropff

would have qualified as an expert.  His testimony was duplicative of other evidence.

And the information he offered was either uncontested or supported by the

overwhelming evidence elsewhere.  There is no probability it affected the judgment.

Thus, this challenge fails under plain error or harmless error review.

2.	The district court properly admitted Bell's testimony.  This Court has

long held that the uncorroborated testimony of an accomplice is enough to support

a conviction.  McMillan relies on principles applicable only to perjury prosecutions.

And, in any event, multiple witnesses and pieces of evidence corroborated Bell's

testimony.

3.	The district court properly denied McMillan's motion for acquittal.

Considerable evidence tied McMillan to the text messages sent from his cellphone,

compounded even further by the standard of review requiring this Court to construe

that evidence in the government's favor.  At the same time, no manifest miscarriage

of justice has occurred on any other ground.   The witnesses, bank records,

timesheets, surveillance footage, and text messages all support that McMillan

knowingly and willingly participated in the scheme.

For those reasons, this Court should affirm.

# ARGUMENT

## I. THE DISTRICT COURT PROPERLY ADMITTED INVESTIGATOR KROPFF'S TESTIMONY.

McMillan contends that the district court allowed Investigator Kropff to mix opinion and lay testimony without first qualifying him as an expert. Appellant's Br. 8. That contention lacks merit.

### A. Standard of Review

For a preserved claim, a district court's decision to admit evidence is reviewed for an abuse of discretion. *United States v. Simmons*, 11 F.4th 239, 261 (4th Cir. 2021) (citation omitted). Any such errors are subject to harmless error review. *Id.* at 262.

Unpreserved claims are reviewed for plain error. *United States v. Watkins*, 111 F.4th 300, 311 (4th Cir. 2024). Plain error requires reversal only if there is "(1) an error; (2) that is clear or obvious under the law at the time of review; (3) that seriously affects the defendant's substantial rights; and (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

## B.    Factual Background

In his opening brief, McMillan identifies two portions of testimony that he challenges on appeal.  In one portion, Investigator Kropff described part of Paul and Williams's text messages as discussing the Emily Myers transaction:

> I'm reading this conversation, and initially I see Ms. Williams talk to Mr. Paul about the Capitol Heights branch and the girl going in blind for a loan that was approved.  And I'm starting to understand that that is the Glenarden transaction where the first female went in and presented the ID to [an NFCU employee], and ultimately she walked out and left.

JA 145.  He then explained what he thought Paul and Williams meant when using the terms "face" and "inside":

> Ms. Williams is then asking Mr. Paul if she should go in with another face, with another ID, if she gets one.  And then she asks Mr. Paul if she can use his inside.

> And to me, my understanding, based on my training, knowledge and experience, inside is often referring to a bank insider or an individual that works in a branch of a financial institution, from the inside, to allow the fraud to -- that aids in the fraud scheme.

*Id*.  In the remaining portion, Investigator Kropff summarized what he saw once he obtained the Laurel Lakes surveillance footage:

> The camera view at the front door, there was an individual standing there that was -- appeared to be looking down several times consistent with the time frame that the messages were being read.

JA 153.

**C.    An Objection Based on Expert Testimony Was Not Preserved, and Any Such Error Does Not Survive Plain Error Review.**

McMillan's claimed error is unpreserved and thus subject to plain error review.  A party preserves a claim for review only if he "states the specific ground" for the objection "on the record," "unless it was apparent from the context."  Fed. R. Evid. 103(a)(1).  Any claim that Investigator Kropff intermixed lay and expert testimony is unpreserved for two reasons.  First, at no point did McMillan's counsel state that impermissible expert testimony from a lay witness was the basis for his objections.  *See, e.g.*, JA 119, JA 144, JA 153, JA 199.  Second, it is not apparent from the context that intermixed testimony was the basis.  The context, to the contrary, supports other bases, like the best evidence rule, *see* JA 124; relevance, *see* JA 144; or speculation, *see* JA 199.  Investigator Kropff offered his interpretations elsewhere without complaint.  *See* JA 143–144.  McMillan elicited Investigator Kropff's interpretations on cross-examination.  *See* JA 249.  And the district court's instructions to the government in response to the objections ("Try again.") did not invite a lengthy colloquy on whether Investigator Kropff should be qualified as an expert.  JA 144.

Nor does any such error survive plain error review.  As explained in more depth below, the district court permissibly admitted Investigator Kropff's testimony to explain his next investigatory steps, which abundant case law allowed it to do.  The admission was neither error nor plain.  Finally, McMillan cannot satisfy the

remaining plain error prongs because he relied on Investigator Kropff's interpretations, the interpretations were largely undisputed, and the interpretations were duplicitous of other evidence from which the jury could have drawn the exact same conclusions.

### D. The Explanations Were Lay Testimony.

Even if preserved, the challenge should fail. Investigator Kropff was explaining his investigation, not testifying as an expert. Under Federal Rule of Evidence 701, a lay witness may offer their opinion testimony if it is rationally based on their perception, helpful to understanding their testimony clearly, or helpful to determining a fact in issue. Lay testimony cannot be based on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c). If it is, then the witness must testify as an expert under Rule 702. *Id.*

Here, McMillan argues that the cited portions of Investigator Kropff's testimony are impermissible narrative testimony by a non-expert witness. Appellant's Br. 10–11. This mischaracterizes the testimony. Investigator Kropff did not give a narrative of the case. Rather, he testified about the information he gathered

and how that information informed the next steps in the investigation.[3]  It is "appropriate to introduce testimony to explain the investigation, or to show an agent's state of mind so that the jury will understand the reasons for the agent's subsequent actions."  *United States v. Johnson*, 117 F.4th 28, 53 (2d Cir. 2024) (citation and internal quotation marks omitted).

Courts have routinely permitted investigators to explain why the investigation unfolded in a particular way.  *See, e.g.*, *United States v. Crespo*, 2024 WL 3439417, at *3 (3d Cir. 2024) (officer "testified about how the video informed his investigation and explained how details in the video led him to particular conclusions"); *United States v. Duran*, 941 F.3d 435, 449 (10th Cir. 2019) (agent "simply explained why investigators had turned their attention to" the defendant); *United States v. Robinson*, 872 F.3d 760, 775 (6th Cir. 2017) (purpose was "to explain to the jury why he launched the investigation" in "the first place, not to tell the jury what conclusions to draw from this investigation").  This places an investigator's explanatory

---

[3] McMillan does not appear to challenge how Investigator Kropff interpreted the terms "face" or "inside."  *See* Appellant's Br. 10.  But to the extent he does, he forfeited that challenge by allowing Investigator Kropff to interpret terms without objection, *see* JA 144–145, and eliciting those same interpretations on cross-examination, *see* JA 256.  *See also Watkins*, 111 F.4th at 311.  For that reason, and the reasons described in the harmless-error section below, any such error would not seriously affect McMillan's substantial rights; or the fairness, integrity, or public reputation of the trial.  *See id.* ("Forfeited arguments are reviewed for plain error." (citations omitted)).

testimony closer to personal-experience testimony under Rule 701 and further from impermissible testimony about the government's theory of the case.

Such is the situation here. Williams was the first person arrested. Investigator Kropff searched her cellphone for potential communications with accomplices, leading him to identify Paul. JA 128, JA 140. Paul's conversation led Investigator Kropff to believe that he had recruited an additional accomplice, because they discussed using another "face" with someone "inside." JA 145. But Investigator Kropff could not identify that accomplice from the text messages alone. So, he "obtained" the "bank video at Laurel Lakes" to "identify that individual." JA 153. He was "looking for someone using their cell phone while Ms. Williams is in the branch." JA 154.

The Laurel Lakes video influenced what Investigator Kropff did next. Because he thought the person standing by the front door was looking down at timestamps consistent with text messages, that grabbed Investigator Kropff's attention, leading him to identify McMillan. Investigator Kropff made this clear during his direct testimony:

Q.    What did you do then?

A.    I asked Investigator Brett Hoover who that person was.

Q.    And who was that individual identified as?

A.    Investigator Hoover identified that individual as Jalen McMillan, the defendant in this case.

16

JA 154–155. The point was to explain the next steps. The government said as much during his testimony, as did Investigator Kropff himself: "So I basically review what evidence is available to me to determine what next investigative steps I need to take." JA 120, JA 125.

This distinguishes the testimony here from the cases McMillan cites— *Johnson*, *Baptiste*, and *Wilson*. The interpretations in those cases were offered as substantive evidence of guilt. *See United States v. Johnson*, 617 F.3d 286, 289–90 (4th Cir. 2010); *United States v. Baptiste*, 596 F.3d 214, 218–19 (4th Cir. 2010); *United States v. Wilson*, 484 F.3d 267, 273 (4th Cir. 2007). The jury needed to agree with those interpretations. Contrast that with McMillan's situation. The jury here did not have to agree with Investigator Kropff. The jury only needed to understand how he identified McMillan as a suspect.

The district court's guardrails underscore this point. When the government could have been perceived as arguably eliciting Investigator Kropff's after-the-fact impressions, the district court sustained McMillan's objections. JA 124–125, JA 144, JA 198–199. In contrast, when the government rephrased to eliminate any doubt that it was eliciting Investigator Kropff's real-time impressions, the district court allowed the questions. JA 124–125, JA 144, JA 153–154, JA 198–199. His conclusions were not offered for their truth. Nor were they offered as substantive proof of guilt. They were offered to explain.

### E.    Any Error Was Harmless.

Even then, the testimony was harmless because Investigator Kropff would have qualified as an expert, the information was duplicative of other evidence, the information is largely uncontested, and the evidence overwhelmingly supported his view. Errors of that type are harmless.

### 1.    Investigator Kropff Would Have Qualified as an Expert.

Investigator Kropff would have qualified as an expert. "The wrongful admission of expert testimony is harmless if the same testimony could have been offered under Rule 702 in the first instance." *United States v. Darosa*, 102 F.4th 228, 237 (4th Cir. 2024) (internal quotation marks omitted) (citing *United States v. Smith*, 962 F.3d 755, 768 (4th Cir. 2020)).

Federal Rule of Evidence 702 permits expert testimony from "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education," where the "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue" so long as the expert's opinion is "based on sufficient facts or data," is "the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts."

***Experience.*** Investigator Kropff met this standard. For starters, McMillan does not dispute that Investigator Kropff would have qualified as an expert, which undercuts his claim. *See, e.g.*, *Darosa*, 102 F.4th at 237 ("Darosa doesn't

meaningfully dispute that Hagler could've been qualified as an expert."). That is likely because Investigator Kropff would have qualified as an expert given his experience. He had a 10-year career in law enforcement with specific training and experience in complex fraud investigations. JA 116–117. Much of his experience involved reviewing text messages. JA 119, JA 257. Indeed, McMillan even relied on that experience on cross-examination when his counsel asked Investigator Kropff to define specific terms. JA 256. Courts have qualified investigators as experts under similar circumstances. *See, e.g.*, *United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019) ("Agent James was a twelve-year veteran of the FBI with substantial experience in drug and gang investigations (conducting controlled buys, interviewing drug dealers and gang members, using gang members as confidential sources, listening to thousands of recorded conversations, and so forth).").

*Methodology.* McMillan does not contest Investigator Kropff's methodology. Regardless, this prong withstands scrutiny, as he used a reliable methodology to form his opinions. The "test of reliability is flexible," and district courts have "broad latitude" to "determine reliability." *Wilson*, 484 F.3d at 274 (citation omitted). An investigator may base his "interpretation on his experience with other investigations as well as the context of this investigation." *Smith*, 919 F.3d at 836.

Here, Investigator Kropff based his conclusions on the context gleaned from examining the thousands of text messages exchanged during the conspiracy, then

comparing them to other specific pieces of information or evidence. JA 273–275. For example, in real time, he thought that Paul and Williams were discussing the Emily Myers transaction. That was, in part, because (1) the timing of the messages synced with the timing of the attempted transaction, JA 135, JA 141; (2) Williams texted Paul a picture of the fraudulent loan approval, JA 141; (3) Williams discussed "IDs that scan," consistent with a fake driver's license for Emily Myers being found at the Laurel Lakes branch, JA 121, JA 142; (4) Paul texted Williams the address for the Laurel Lakes branch, JA 144; and (5) Williams identified herself as "Emily Myers" around the time she entered the bank, JA 145. By connecting his interpretations to specific datapoints, the district court and McMillan could scrutinize them.

*Conclusions.* Lastly, a defendant who challenges the interpretations should identify how they were faulty and how they prejudiced him. *Cf. United States v. Kilpatrick*, 798 F.3d 365, 383 (6th Cir. 2015); *United States v. Albertelli*, 687 F.3d 439, 449 (1st Cir. 2012). Here, McMillan does so only fleetingly.

On appeal, as he did at trial, he disputes whether the Laurel Lakes video depicts him looking at his cellphone. *See* Appellant's Br. 11. But McMillan's counsel had ample opportunity to cross-examine Investigator Kropff about the video. On cross-examination, Investigator Kropff acknowledged that he could not see what McMillan was looking at or his fingers moving consistent with texting.

JA 253–254.  Assuming McMillan was holding a cellphone, Investigator Kropff also acknowledged a few innocent explanations for looking at it.  JA 254.  And he acknowledged that investigators found no text messages between Williams and McMillan.  JA 252.

On these grounds, the district court would have been well within its discretion to admit that testimony under Rule 702.

### 2. The Testimony Was Duplicative, Largely Uncontested, and Overwhelmingly Supported by Other Evidence.

An evidentiary error is harmless if it is "highly probable that it did not affect the judgment."  *United States v. Walker*, 32 F.4th 377, 394 (4th Cir. 2022) (citation omitted).  Here, any error was harmless because the challenged testimony was duplicative of other evidence, and much of it was uncontested.

Investigator Kropff thought Paul and Williams were discussing the Emily Myers transaction, and he explained what happened during the offense.  JA 145.  But Williams made clear what they were talking about: "Emily Myers.  I can go in now?"  JA 145.  Investigator Kropff had already detailed the circumstances of the transaction.  JA 120–130.  Multiple other witnesses testified about what happened, including the real Emily Myers and the two bank tellers who serviced the transaction.  JA 66, JA 87, JA 106.  Moreover, it was uncontested that the transaction was fraudulent and that Paul helped Williams carry it out.

Investigator Kropff also defined the terms "face" and "inside." JA 145. But the definitions were uncontested, and multiple witnesses testified about that conduct. McMillan's counsel elicited the same exact information on cross-examination. JA 249, JA 256. Multiple witnesses testified that the Emily Myers transaction involved fake driver's licenses. JA 90, JA 111, JA 120. Williams left one of the fake licenses at the Laurel Lakes branch. JA 121. Likewise, Bell described the insider role in detail, including that he and McMillan were Paul's insiders at the bank. JA 352–353.

Finally, Investigator Kropff believed that, in the Laurel Lakes video, McMillan was looking down at times consistent with the text message exchanges. JA 153. No one contests that McMillan was working that day or that he was depicted at the front door in the video. Rather, the only dispute is whether he was looking at his cellphone—the implication being that he was involved in the offense.

There were multiple pieces of evidence, however, from which the jury could have drawn the same conclusion, including their own observation of the same video. But there was more. Investigators seized the cellphone from McMillan's person. JA 156–157. Paul texted the name "Emily Myers" to McMillan as surveillance footage showed Williams in the bank. JA 120, JA 682, JA 916. Paul and McMillan texted in real time, leading to the "Dip now" text urging Williams to leave. JA 160. McMillan's cellphone required a passcode, and nothing suggests that any other

person used the cellphone during that incident. JA 258. What's more, McMillan's counsel cross-examined Investigator Kropff about his interpretation, getting him to acknowledge several ambiguities in the footage. JA 253–254.

That evidence aside, the government presented overwhelming evidence that McMillan used his cellphone while participating in numerous transactions, dispelling any notion that his involvement in the Emily Myers was a misunderstanding. Paul and McMillan consistently texted each other before Paul or an accomplice entered the bank and completed the transaction. During the transactions where the text messages align, McMillan was working that day, and his employee ID number or name appears on the paperwork for the exact transaction described in his text messages. *See, e.g.*, JA 171, JA 602. Sometimes the surveillance footage shows him actively participating in the transaction described in his text messages. *See, e.g.*, JA 196, JA 616.

Besides, communications throughout the scheme make clear that the person being texted is in fact McMillan. To illustrate, McMillan referred to himself as "Jalen" when talking to Paul during the "Zion Davis" transaction. JA 183. Paul directly referenced "Jalen" as a participant in another fraudulent transaction. JA 402.

Given the overwhelming evidence that McMillan was using his own cellphone, there is almost zero probability that Investigator Kropff's interpretation affected the judgment.

## II. THE DISTRICT COURT PROPERLY ADMITTED BELL'S TESTIMONY.

Next, McMillan argues that the district court erred when it admitted Bell's testimony because it was the uncorroborated testimony of an accomplice. Appellant's Br. 11–13. Because this claim meets no prong of plain error review, it should fail.

### A. Standard of Review

McMillan acknowledges that this claim is reviewed for plain error. Appellant's Br. 11. Under plain error review, this Court must affirm unless (1) there is error; (2) that is plain; (3) the error affected the defendant's substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olson*, 114 F.4th 269, 273 (4th Cir. 2024).

### B. Uncorroborated Accomplice Testimony Can Support a Conviction, and Bell's Testimony Was Thoroughly Corroborated.

McMillian's argument mainly fails because it rests on a faulty premise. Contrary to his view, this Court has long held that a conviction may rest on uncorroborated accomplice testimony. *United States v. Robertson*, 68 F.4th 855, 863 (4th Cir. 2023) (quoting *United States v. Baker*, 985 F.2d 1248, 1255 (4th Cir. 1993)).

McMillan cites *Hammer v. United States*, 271 U.S. 620 (1926). But *Hammer* is narrow. It applies only to one element (falsity) of one offense (perjury). *See id.* at 626 (asserting the "general rule in prosecutions for perjury"). As this Court has

explained, "in a perjury trial the evidence must consist of something more convincing than one man's word against another's." *United States v. Beach*, 296 F.2d 153, 155 (4th Cir. 1961). Because *Hammer* is inapplicable here, McMillan cannot meet any plain error prong.

That remains true even on the merits. McMillan can meet no plain error prong because Bell's testimony was thoroughly corroborated. Witness testimony and several pieces of evidence—including text messages, timesheets, surveillance footage, and membership applications for the various transactions—all corroborated that McMillan was Paul's inside man.

Take one example. One transaction that Bell described involved working with McMillan and Paul to get a fraudulent loan for $18,000. They used the identity of a real person, Alexander West. A yearbook showed that the three men went to high school together. JA 551–555. Bell read aloud his text conversations with Paul. The day of the transaction, Paul texted him a photo of a fake driver's license for Alexander West, bearing Paul's photograph. JA 391. They discussed looping in McMillan to help open the account and approve the loan: "Jalen is going to have to approve it." JA 393. Paul and Bell narrated the transactions in real-time, unshy about the fraud: "Let him know the name Alexander West. I'm sitting down." JA 399. The openly discussed the involvement of a third person named "Jalen." The real Alexander West testified that he had nothing to do with the transaction. JA 460.

At the same time, bank records show that McMillan used his employee ID number to help establish the account. JA 308–309, JA 486, JA 673–674. That same day, the loan application was approved for $18,000. JA 311, JA 677. Timesheets show that McMillian was working at the time. JA 311, JA 677. Paul confirmed who was helping him: "So loan with Jalen." JA 402. Investigators later found the fake driver's license in Paul's apartment. JA 35, JA 460, JA 482.

Abundant evidence corroborated McMillan's role in the Alexander West transaction alone. It is indicative of the evidence introduced throughout the trial. The district court did not err—plain or otherwise—in admitting this testimony.

## III. THE DISTRICT COURT PROPERLY DENIED MCMILLAN'S MOTION FOR ACQUITTAL.

Finally, McMillan argues that the district court erred in denying his Rule 29 motion. Appellant's Br. 14. Specifically, he contends that the evidence was insufficient to show that he participated in the scheme or acted with criminal intent. Appellant's Br. 15–16. These contentions must fail.

### A. Standard of Review

This Court reviews *de novo* the denial of a motion for judgment of acquittal. *United States v. Briscoe*, 101 F.4th 282, 299 (4th Cir. 2024). "The verdict must be upheld if it is supported by substantial evidence," and this Court reviews the evidence "in the light most favorable to the Government." *Id.* (citation omitted).

The defendant bears a heavy burden. *United States v. Hunt*, 99 F.4th 161, 184 (4th Cir. 2024). "[A]ll reasonable inferences are drawn in favor of the prosecution, with the presumption that the jury resolved all evidentiary conflicts in the Government's favor." *Id.* (citations omitted). Thus, this Court "will not disturb the verdict if, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation and internal quotation marks omitted).

## B. The District Court Appropriately Denied the Rule 29 Motion About McMillan's Text Messages.

At trial, McMillan made only one argument in support of his Rule 29 motion: that there was insufficient evidence to show that he was the person who sent the text messages on his cellphone. JA 531. The defendant may move for acquittal "[a]fter the government closes its evidence" if he believes "the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Here, abundant evidence tied McMillan to his own text messages. Investigator Kropff testified that he seized the cellphone from McMillan. JA 157. The parties stipulated that the cellphone was seized from McMillan's person. JA 156. The cellphone required a passcode to access it. JA 258. Investigators accessed the text messages only after McMillan gave them the passcode. *Id.*

The conversations also corresponded to crimes that occurred while McMillan was working. For instance, he identified himself as "Jalen" while discussing the

"Zion Davis" transaction. JA 183. This alone was more than enough to tie him to the messages. Then his employee ID number appeared on the "Zion Davis" membership application. JA 170. He discussed opening a fraudulent account for Felicia Franco. JA 471. His employee ID number appeared on the Felicia Franco membership application. JA 297. Surveillance footage showed McMillan with the woman who pretended to be Felicia Franco. JA 302–303, JA 470, JA 645. He texted extensively about the Emily Myers transaction, conveying information that only an NFCU employee would know. JA 159–160. His presence on the surveillance footage is what led investigators to identify him as a suspect. JA 154–155. At the same time, nothing suggested that any other person used his cellphone.

This is more than sufficient on its face—even more so when the facts must be construed in the government's favor.

## C. For Any Other Grounds, McMillan Cannot Show a Manifest Miscarriage of Justice.

To the extent McMillan argues that insufficient evidence supports his participation or intent, he did not make that argument in his Rule 29 motion. He thus forfeited that argument, and he fails to meet the exacting standard to excuse the forfeiture on appeal. When a defendant raises specific grounds in a Rule 29 motion, he forfeits on appeal any ground he did not raise unless "a manifest miscarriage of justice has occurred." *United States v. Duroseau*, 26 F.4th 674, 678 (4th Cir. 2022)

(citing *United States v. Chong Lam*, 677 F.3d 190, 200 & n.10 (4th Cir. 2012)).  Here, McMillan has not alleged, let alone shown, a manifest miscarriage of justice.

Nor can he.  His offenses of conviction all required him to act knowingly.  *See Dubin v. United States*, 599 U.S. 110, 115 (2023) (aggravated identity theft); *United States v. Burfoot*, 899 F.3d 326, 335 (4th Cir. 2018) (§ 1349 conspiracy); *United States v. Brandon*, 298 F.3d 307, 311 (4th Cir. 2002) (bank fraud).  Extensive evidence supported this element.  Bell testified that McMillan participated in exchange for a cut of the proceeds.  JA 351, JA 353.  McMillan's employee ID number appears on the fraudulent membership applications.  JA 170, JA 297.  Surveillance footage and timesheets put McMillan at the relevant places at the relevant times.  JA 602, JA 644, JA 681.  Sometimes the surveillance footage showed McMillan interacting with other members of the conspiracy, like the woman who pretended to be Felicia Franco.  JA 89, JA 96, JA 302–303, JA 470, JA 645.

This was no coincidence.  There was no accident or mistake.  His text messages openly discussed how to help Paul or Williams succeed.  He told Paul how to successfully open the "Zion Davis" account: "Come in now and say [K]elly told you to come to Jalen."  JA 183.  He gave Paul the fraudulent sponsor information for Felicia Franco: "Her grandfather sponsoring her, Alexander Oduro, access [code]."  JA 471.  And he instructed Williams to leave when the Emily Myers transaction fell apart: "Dip now."  JA 160.

On top of that, to shore up the conspiracy count, the government presented evidence of three additional fraudulent transactions (Matthew Fordham, Patrick Johnson, and Alexander West), each with its own damning evidence. For example, surveillance footage showed McMillan and Paul sitting across from each other carrying out the Matthew Fordham transaction, where Paul fraudulently obtained $15,000 in cash. JA 196, JA 616. Paul pretended to be Matthew Fordham for that transaction. Bank records show that McMillian withdrew the money himself. JA 192. Afterwards, Paul texted McMillan: "Bro, don't ever speak on this. Just know we straight." JA 195. McMillan responded: "'Nuf said." JA 195. Text messages for the Patrick Johnson transaction show McMillan and Paul coordinating the transaction in advance and coordinating the right time to carry it out. JA 229–230, JA 238–239. For the Alexander West transaction, Paul arrived at the bank pretending to be Alexander West. JA 399. McMillan's employee ID number was used to open the account. JA 308–310.

Given that plenty of evidence proved McMillan's participation and intent, he cannot show a manifest injustice for his forfeited claims.

## CONCLUSION

For those reasons, the Court should affirm.

Respectfully submitted,

Erek L. Barron
United States Attorney

David C. Bornstein
Assistant United States Attorney
Chief, Appellate Division

_____/s/_____
Brandon K. Moore
Assistant United States Attorney

December 20, 2024

## STATEMENT ON ORAL ARGUMENT

The United States respectfully submits that oral argument is not necessary in this case. The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

## CERTIFICATE OF COMPLIANCE

1.     This brief was prepared using Microsoft Word, Times New Roman, 14-point font.

2.     Excluding the corporate disclosure statement; table of contents; table of authorities; statement on oral argument; any addendum containing statutes, rules, or regulations; and the certificate of service, this brief contains 6,729 words.

## CERTIFICATE OF SERVICE

I certify that, on December 20, 2024, I electronically served a copy of this brief on all counsel of record via CM/ECF.

/s/
_____
Brandon K. Moore
Assistant United States Attorney
